FILED
2008 Mar-24  AM 09:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| **KENNETH R. SIMS,** )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>**PETE GREEN, SECRETARY OF** )<br>**THE ARMY,** )<br>)<br>Defendant. )<br>) | Civil Action Number<br>**5:06-cv-1338-UWC** |

**MEMORANDUM OPINION ON
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The present action was initiated by Kenneth R. Sims ("Sims"), against The United States Army ("Army") for alleged gender discrimination with respect to a promotion sought by Sims.  *See* 42 U.S.C. § 2000e, *et. seq*.  For the reasons set forth below, the Court finds that the Army is entitled to summary judgment.

**I. FACTS** [1]

At all relevant times, Sims was a GS-13 Environmental Protection Specialist.[2]  On June 10, 2004, the Army posted a Vacancy Announcement seeking applicants for a GS-14

---

[1] On a motion for summary judgment, the Court must view all the facts in the light most favorable to the non-movant.  *DeJulio v. Georgia*, 276 F.3d 1244, 1258 (11th Cir. 2001).

[2] Sims retired from the Army with an effective date of September 3, 2006.

Environmental Protection Specialist, who would serve as the Chief of the Environmental Policy, Compliance & Remediation Branch at the Redstone Arsenal ("Policy Chief") located in Huntsville, Alabama.  (Doc. 24, Def.'s Ex. 6.)  After submission of resumes, a referral list of candidates was generated, which included eight males and one female.  Both Sims and the ultimate selectee, Ms. Sharon Mitchell ("Mitchell"), were on the list.

Mr. Randy Gallien ("Gallien"), who was the Chief of the Environmental Division, was the selecting official for position.  He appointed a three-person panel to review the applications of the nine referred applicants.  The selection panel was comprised of one woman, Vernal Scales, and two men, David Hasley and Bill Cooper.  Although each panel member knew the identity of the other members, they did not meet.  Instead, each member independently reviewed the application packets and rated the applicants based upon a ten item task list:

1. Supervise and direct staff of personnel performing engineering analysis of the major Army Acquisition Program activities to determine potential for environmental effects;

2. Serve as regulatory advisor and environmental compliance expert responsible for planning, managing, directing, and implementing a major segment of the U.S. Major Command's, or equivalent, environmental program;

3. Manage interdisciplinary team of scientists and engineers to analyze unique and highly controversial weapons systems development and testing;

4. Develop and interpret new or revised environmental policies, methods, and techniques and instruct others on necessary implementation;

5. Provide authoritative environmental regulatory compliance advice and

        consultation to the highest levels of management within and outside of the U.S. Army, or equivalent;

6. Represent a U.S. Army Major Command, or equivalent, in liaison with nationally elected officials, state governments, and members of governments of foreign nations on technical matters dealing with environmental effect or environmental engineering principles;

7. Exercise expert judgment in diverse and many times controversial environmental compliance areas to include air pollution, water quality, hazardous wastes, noises, and endangered and threatened species;

8. Perform oral and written communication to develop and present decision and information briefs to upper level command, Army, and DOD management;

9. Advise Program and Product Managers on environmental requirements relative to the Army and DOD acquisition processes; and

10. Represent a U.S. Army Major Command, or equivalent, and/or Project and Program Offices in public forums.[3]

(Def.'s Ex. 10.)  Additionally, each applicant was evaluated based upon whether his or her resume demonstrated certain levels of education, training, and relevant awards.  (*Id*.)

After each selection committee member submitted their scores to Gallien, he tallied them for each applicant.  Sims received a total score of 93, while Mitchell received a total score of 102; each of the selection committee members had rated Mitchell slightly higher than Sims.

Gallien then interviewed the six top ranked applicants.  The interview questions were meant to judge a candidate's level of political policy insight, their approach to

---

[3] Each of the ten items on the task list was assigned a specific weight.

3

problem solving, their perspective on the vacant position, and why they wanted the position.  The questions included broad inquiries into the applicants' knowledge and sensitivity to policy and political issues, because the vacant position involved considerable interaction with regulatory agencies, foreign governments, the State Department, and Congress.  Finally, the questions sought to uncover the candidate's management and technical expertise.

After each interview, Gallien rated each applicant on an eight point scale.  He gave Sims a rating of six points and Mitchell a rating of seven points.  These scores combined with the scores of the selection committee led Gallien to select Mitchell as the best qualified applicant for the position.

Sims has a B.S. in Zoology with a minor in Mathematics.  (Def.'s Ex. 8.)  He also has a Master's Degree in Wildlife and Fisheries Management.  During his thirty years in the Army, Sims supervised employees for over seven years.  (*Id*.; Pl.'s Br. at 17.)

Mitchell has a B.S. in Industrial and Systems Engineering.  During Mitchell's fifteen years in the Army, Mitchell supervised employees for approximately nine months when she served in the posted position as the Acting Policy Chief prior to her selection as the permanent Policy Chief.  (Def.'s Ex. 12.)

According to Sims, he had experience conducting compliance and restoration work, which he believes is more germane to the posted position.  (Pl.'s Ex. A at 45-46.)  However, according to Gallien, Mitchell did have some compliance experience.  (Pl.'s

Ex. A at 116.)  Additionally, Sims points out he had seven years of supervisory experience, while Mitchell had less than one year of such experience.

Gallien testified that he selected Mitchell for several reasons.  Although Gallien admits he did not know much about Sim's experience in Germany, Gallien testified that he had to look at how much regulatory interface was emphasized in the materials submitted by each applicant.  Based upon those materials, he believed Sims' tours in Germany and Kwajalein Atoll had interrupted some of his program interface and limited his direct acquisition experience.  According to Gallien, acquisition experience was critical.  (Pl.'s Ex. A at 69-70, 110-11, 118-20.)

During an EEO investigation into the instant matter, Gallien explained that after Mitchell's selection he came to believe that Sims' resume did not reflect the breadth of his regulatory experience.  However, at the time when the selection was made, Gallien believed that Sims had more experience with German, rather than U.S. regulations.  Thus, as Gallien saw it, there would be a learning curve for Sims to get back up to speed regarding U.S. regulations.  (*Id*. at 69-70, 110-11.)

Gallien also testified that he believed Sims' application focused more on the application level, the "doer level, nuts-and-bolts level, as opposed to the policy of managing a program . . . ." (*Id*. at 69-70.)  This nut-and-bolts experience encompasses a very small part of the regulatory process testified Gallien.  He was looking for an individual to work above the nuts-and-bolts level: someone who had "gone

through the interpretive process of those regulations and ha[d] dealt with regulatory agencies in doing so." (*Id*. at 106-7.) Gallien focused on finding someone who could avoid restoration type activities by understanding the requirements and advise senior level people "who are doing other rocket science projects of how to stay away from having restoration done." (*Id*. at 108.)

## II. ANALYSIS

Sims contends that Gallien's purported reasons for selecting Mitchell are pretextual for several reasons. First, Sims contends he was more qualified for the position than Mitchell because he had more supervisory experience and more experience conducting compliance and restoration work. Second, according to Sims, persons who worked with Mitchell have complained about her poor performance, lack of knowledge, and embarrassing behavior at meetings. (Pl.'s Br. at 20-21.) Finally, Sims points to evidence that selection committee member Vernal Scales, who has experience with acquisitions, budgeting and funding, purportedly did not have detailed knowledge about what occurs in the environmental division.

None of the evidence upon which Sims relies provides evidence of pretext. At most, the evidence suggests that a different decision maker, focusing on different criteria and using a different selection committee, might have selected Sims, rather than Mitchell. While Sims is of the opinion that his compliance and restoration work were more

germane to the position, the vacancy announcement did not indicate that such experience was paramount. Additionally, Gallien, the decision maker did not find such experience compelling. Rather, Gallien was looking for someone who had more policy level experience and in Gallien's opinion Mitchell possessed such experience.

It is not the role of the Court to "sit as a super-personnel department that re-examines" the defendant's employment decisions. *Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991). An "employer has the discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria." *Texas Dept. Of Comm. Affairs v. Burdine*, 450 U.S. 248, 259 (1981). Thus, a Plaintiff's pretext claim will fail where he merely questions the wisdom of the employer's reasons, at least where the reason is one that might motivate a reasonable employer. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997). Sims has pointed to nothing in the record which might indicate that a reasonable employer would not be motivated by the reasons proffered by Gallien.[4]

Similarly, Sims has pointed to nothing in the record which might indicate that Gallien and the members of the selection committee were aware of any complaints about Mitchell when they awarded her the position. Thus, any evidence about her purported poor performance is irrelevant.

---

[4] The Court notes that the United State Supreme Court's rejection, in *Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006), of the Eleventh Circuit's "slap you in the face" standard does not compel a different result.

Finally, it is of no moment that Vernal Scales may have lacked detailed knowledge about the environmental division. It is undisputed that she had experience with acquisitions, budgeting and funding; three areas in which the selectee would be called upon to handle and/or oversee. It is also significant that Gallien, the final decision maker, had such detailed knowledge because he had recently held the position as Chief.

Because Sims has raised no genuine issues of material fact, summary judgment is appropriate.

## CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment will be granted by separate order.

Done this 24th day of March, 2008.

_____
U.W. Clemon
United States District Judge